Name: Irvin Musgrove - Pro Se

Address: 1540 S Escondido Blvd Apt 2310, Escondido, CA 92025

Telephone Phone: 760-207-1860

Email: irvinvsoha2020@outlook.com

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Musgrove<br><br>, Plaintiff(s),<br><br>v.<br><br>Hanifin, Pierce, Machado, Sandoval-Soto Oceanside Housing Authority<br><br>, Defendant(s). | Case No.: ___20- cv- 0614___<br>(assigned at time of filing)<br><br>**7TH AMENDED COMPLAINT**<br><br>DATE: 10/18/2021<br>TIME:<br>ROOM: 2D<br>JUDGE: Hon. Gonzalo P. Curiel |

# THIS AREA LEFT BLANK INTENTIONALLY

1

Plaintiff IRVIN MUSGROVE ("IRVIN") PRO SE, an individual on behalf of myself and NOAH MUSGROVE ("NOAH"), who is my son was also adversely affected by their actions, hereby alleges as follows against DEFENDANTS: OCEANSIDE HOUSING AUTHORITY ("OHA"), ANGIE HANIFIN ("ANGIE"), MARGERY PIERCE ("MARGERY "), KEYSA MACHADO ("KEYSA") and SUSANA SANDOVAL-SOTO ("SUSANA").

## INTRODUCTION

1.     Irvin Musgrove 55 & Noah Musgrove 12, are Father & Son that were part of the OHA in its Section 8 program. We were blessed with Section 8 through the OHA under the 'UNIFICATION PROGRAM or FUP, as 1 family of 30+ who took part, due to our being in the reunification process with CPS, in the interest of being stable. We were later failed by OHA and its staff members above, after 8-9 stable years, with their acts of ' INTENTIONAL DISCRIMINATION'.

2.     This is an action to secure relief for the violations of our rights guaranteed by the Unruh Civil Rights Act, California Civil Code § 51 ("Unruh Act"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the Fair Housing Act 42 U.S.C. § 3604 (3)(B) ("Section 3604"), 24 CFR § 100.7 - Liability for Discriminatory Housing Practices (" Section 100.7"), and 24 CFR § 100.204 - Reasonable Accommodations.

3.     Unruh Civil Rights Act , Cal . Civ . Code  § 51 provides protection   from discrimination by all business establishments in California, including housing and public accommodations.

4.     Section 504 of the Rehabilitation Act of 1973 prohibits discrimination based on disability in any program or activity receiving federal financial assistance.

5.     The Fair Housing Act 42 U.S.C. § 3604 (3)(B) prohibits the refusal to make accommodations  in rules , policies , practices , or services , when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.

6.      Section 100.7 Liability For Discriminatory Housing Practices holds a person liable for their own conduct and for failing to take prompt action to correct and end a discriminatory housing practice by that person's employee or agent where he/she should have known of the discriminatory conduct.

7.      Section 100.204 Reasonable Accommodations **-** makes it unlawful for any person to refuse to make reasonable accommodations in rules, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit.

## A Little Background of Relevancy

8.      Our 1st Apartment on Section 8 was at 'The Boulevard Apartments ' at 1904 College Blvd, Oceanside, CA 92056, on March 1, 2012.

9.      In 2014, a very stressful event occurred, which put my apartment of 2 years in jeopardy. Keysa needed documentation and I told her I would get it to her on Monday because this was on a Friday. She called the apartment manager, Danielka Edwards, and told her r my contract was being terminated. Danielka called me to the office to explain the termination issue. She went on to prepare me for the fact that if anyone came in over the weekend and took interest in my apartment, with a pending termination from the program, and told Danielka or the duty person they wanted it, I'd have no choice but to move out.

10.      I stressed to the max over that weekend. Monday came and I rushed on the Sprinter train to my Psychiatrists office to obtain a form and thank God I had an appointment that morning . I told the receptionist my dilemma and she called my Dr. I was then taken back by the nurse for my vitals. For the only time in my life, my blood pressure was through the roof and the nurse advised me to calm down. I got to Dr. Walker's office and told her I couldn't stay for my appointment and why, so she wrote what I'd need for the Welfare office.

11.      When I arrived at the OHA, Susana was off, so I got my 1st opportunity to meet with Margery. I complained about Keysa's actions. I also told her about some unrelated occurrences. I contacted her on a couple of other occasions with quick replies from her. **EXHIBIT 5**

12.      We moved to Oceana Apartments at 180 Canyon Dr., Oceanside, CA 92054, on July 5, 2016. We lived there 1 day from 2 years comfortably, yet grieving, before Susana made herself really known in our lives.

13.   I, Irvin Musgrove  - Pro Se Plaintiff , as an individual , bring this action to recover damages including, 'Compensatory Damages' including 'Punitive', for the harms done to my family. I also will ask for 'Injunctive Relief', so that in the future the OHA will provide the proper support while maintaining the integrity that their client both need & deserve.

14.   Unless enjoined , Defendants  will continue to engage in the unlawful acts and practices of 'Intentional Discrimination ' complained herein. Plaintiff has no adequate remedy at law. Accordingly , Plaintiff and future Section 8 recipients by the OHA are entitled to 'Injunctive Relief'.

15.   An actual controversy has arisen and now exists between the parties concerning their respective rights and obligations under federal and state law.

## JURISDICTION AND VENUE

16.   This Court has jurisdiction over Plaintiff's claims arising under the Unruh Civil Rights Act, Cal. Civ. Code § 51, pursuant to 28 U.S.C. § 1331.

17.   Plaintiff 's state law claims  are so related  to those  under which this Court has original jurisdiction that they form part of the same case and controversy. Supplemental jurisdiction is therefore appropriate over Plaintiff's remaining claims pursuant to 20 U.S.C. § 1367.

18.   This Court has jurisdiction over Plaintiff's claims for declaratory and injunctive relief pursuant to 28 U.S.C. § § 2201 and 2202, as well as Federal Rule of Civil Procedure 65.

19.   Venue is proper in this Court pursuant to U.S.C. § 1391 (b), because the events giving rise to the claims made herein occurred in this Judicial District , and the Co-Defendants  are employed & the Defendant OHA has its principal place of business, within this District.

## THE PARTIES

20.   Irvin Musgrove, Pro Se Plaintiff and Noah Musgrove who is not entered as a Plaintiff, but has every right to be. We are residents of the County of San Diego, CA.

21.   Defendant Angie was my Case Manager at OHA during that period of time and is being sued in her official capacity.

22.   Defendant Margery was the Director at OHA during that period of time and is being sued in her official capacity.

23.    Defendant Keysa was a Supervisor at OHA during that period of time and is being sued in her official capacity.

24.    Defendant Susana was my Case Manager at OHA during that period of time and is being sued in her official capacity.

25.    OHA runs the Section 8 Program, which is a 'Federally Funded' Housing Program, located at N . Nevada St., Oceanside, CA 92054. It serves many recipients who reside exclusively within the City of Oceanside . They're funded by The Department of Housing & Urban Development ("HUD") and its recipients pay between 30-40% of their adjusted income . The OHA, being federally funded by HUD, adheres to HUD's policies & procedures unless it's unable to do so, which would be determined on a case by case basis. While on Section 8, a tenant deserves to live in a home that's both sanitary and safe. Therefore, each household will be expected to undergo an annual HQS inspection by an OHA inspector.

## REASONABLE ACCOMMODATIONS

26.    *The Department of Justice ("DOJ") and the Department of Housing and Urban Development ("HUD") are jointly responsible for enforcing the federal Fair Housing Act (the "Act"), which prohibits discrimination in housing on the basis of race , color , religion , sex , national origin , familial status , and disability . One type of disability discrimination prohibited by the Act is the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with a disability the equal opportunity to use and enjoy a dwelling.*

27 .    *HUD and DOJ frequently respond to complaints alleging that housing providers have violated the Act by refusing reasonable accommodations to persons with disabilities . This Statement provides technical assistance regarding the rights and obligations of persons with disabilities and housing providers under the Act relating to Housing providers that receive federal financial assistance are also subject to the requirements of Section 504 of the Rehabilitation Act of l973. 29 U.S.C. § 794. Section 504, and its implementing regulations at 24 C.F.R. Part 8, prohibit discrimination based on disability and require recipients of federal financial assistance to provide reasonable accommodations to applicants and residents with disabilities.*

# DEFENDANTS DISCRIMINATORY ACTIONS

28.   Susana: **Intentional Discrimination, Intentional Infliction of Emotional Distress, Conspiracy, Immediate Refusal of RAR**

29.   The OHA 'Annual Inspection' occurs once every year and 3-4 years ago it was changed to every 2 years. 'The inspector inspects the stove, outlets, garbage disposal, etc. and makes a note of what need to be repaired. Then the Manager & Inspector communicate and schedule the re-inspection. **EXHIBIT 1** The tenant will learn of the scheduled date by mail. Ours began in May and the last inspection deadline was on June 30, 2018. Our final repair was a tiny light on the exhaust fan in the bathroom. It had been repaired 1 1/2 weeks prior to deadline. The Manager & Inspector somehow had a lapse in communication and failed to re-schedule the inspection of our unit. None of the repairs that were needed were tenant caused. It had slipped my mind which is a problem I've had since 2013 and Susana was aware of it.

30. On July 3, 2018, Wendy, the Apt Manager, mentioned that OHA hadn't paid their rent portion. I went to the OHA office and asked the receptionist, Patricia Lozano who will be with OHA for 24 years as of September 2021, and she told me the computer said I didn't want to live there any longer. I told her there must be a mistake because I'd written a statement a month prior, at Susana's request, stating my intent to stay at Oceana. She suggested that I write another one so that OHA could release its payment, and so I did.

31. On July 9, 2018, I received a 'Notice of Termination of Housing Voucher' in the mail, due to a failed inspection. I went to call Susana and she confirmed it. I then called Sara, the Housing Inspector, and told her about the termination. She said she'd come out special, because she knew of my situation, and so that my voucher could be reinstated. She arrived within the hour and saw a roach and freaked out. She said it would need to be fumigated 1st. It was sprayed later that week.

32. On July 17, 2018, Sara returned and told me she'd start where the repair in need was in case she saw another roach. The inspection passed and she said she'd take it personally to Susana. I called Susana less than an hour later to ask about being reinstated. She told me that her hands were tied and I'd have to move out. I told her Sara had come out special so that we could be reinstated and she told me Sara didn't know what she was talking about and didn't know about the termination. I didn't want to get Sara in trouble so I pleaded with her to please reinstate our voucher because we needed to remain stable and she

5

repeated her hands were tied.  **EXHIBIT 3B 20 & 20A**

33.    I then began to plead with Susana: how we couldn't afford to move out, how we needed to remain stable, how my depression would worsen and how remaining stable would eliminate that possibility, how I couldn't move our heavy furniture from the 2nd floor & down the stairs with a hip scheduled for surgery, how I'd lose most of my furniture, how I couldn't afford a truck and storage unit, how Noah liked it there and needed to be stable, how we didn't want to be homeless, etc. *My pleas qualified as a RAR*. **EXHIBIT 20A** She only repeated her hands being tied. *Susana's immediate refusal proves she gave us no 'Appropriate Consideration'*. **EXHIBIT 20A** She had the option of re-instating the voucher and she could have re-scheduled the inspection at the start. **EXHIBIT 3B** Susana was actually supposed to being the 'Abatement' process. on July 1, 2018 **EXHIBIT 14** *Which is plainly stated definitively on their own website*. **EXAMPLE 3A** She also wasn't supposed to 'Terminate the Voucher' until I found housing. **EXHIBIT 14** *Which is also stated definitively on their website*. **EXHIBIT 3A**. My family was not responsible for any damage that called for repairs. **EXHIBIT 14A**

34.    I didn't know it at the time, but Angie later admitted to making the decisions with Susana. They both intentionally discriminated against us by choosing not to follow OHA's normal operating procedures, which would have been the 'Abatement' on July 1, 2018. **EXHIBIT 14** The abatement would have guaranteed that we would have been able to keep our apartment because it passed the next week. At the least we would have been able to remain in our home until we located another unit, *details below*. Susana & Angie deciding not to follow procedure only in our case, was 'Intentional Discrimination' with 'Malice', especially knowing we would become homeless. **Note:** Guarantees from their website are pasted below: **EXHIBITS 30 & 30A**

## 35.    What happens if the owner still doesn't correct the problems?

The Housing Authority will automatically re-inspect the unit.  If the owner fails to correct the problems, the Housing Authority will stop paying the landlord.  The owner will not receive any Housing Assistance Payments until the repairs have been made and verified by a Housing Authority Inspector. However, you must still keep paying your portion of the rent so that you are still meeting the terms of the lease.  The Housing Authority's abatement of the unit should not lead to an eviction.

## 36.    What happens if I don't want to move?

In order to receive Section 8 assistance, you must live a unit which is decent, safe and sanitary. You will have up to 120 days to find new housing. If you do not find housing within 120 days, and the unit still does not pass inspection, you will lose your Section 8.

                                        **Note:** Refers to the same unit.

## SUSANA'S DISCRIMINATION OF A VET THAT CONTINUES

Wednesday 07/24/2019

Connie Fisher,

37.    James planned on moving out of his apartments and move into the senior apartments about 2 blocks away. He's preferable to a much quieter environment and got Section 8 under the V.A.S.H. program. He's also black, male and a disabled VET. He had been on their waiting list for quite a few months and finally received the call he'd longed for. The manager invited him to go and look at his future residence and to discuss their next move. He loved it because of the peace & solitude so he left her with a $240 deposit to hold it and her being very familiar with OHA gladly accepted it knowing their requirements. He then went with excitement and gave his current manager the proper notice re: his intent to move. When the time was right, he proceeded to the OHA office to get the RFTA form for the inspector to fill out. When he got there, he told the receptionist that he needed the form and she told him he couldn't get the form until he moved out. He told her she must be wrong because that made no sense. She repeated herself and so did he. Suddenly my worker, Susana Soto, emerged from her office and took over the conversation because her office is feet from the reception area. She firmly told him that he'd have to completely move out and bring the proof before he could get the RFTA form he needed. He told her it didn't make sense and wanted to know what he was supposed to do with his furniture & belongings and also where was he supposed to stay during the days until the inspection was scheduled.  **EXHIBIT 38**

38.    She repeated what she had told him in a ruder way and wouldn't allow him to speak again about it. He turned and left in disgust and returned to the manager of the Senior Apartments and explained what had occurred to which she also disagreed with what he was told, from having experience with OHA's procedures. He was left with no other alternative but to forfeit the $240 deposit he'd given to her and go to his manager to inform her that he no longer had plans to move. More importantly he was blatantly denied his right to live as a disabled veteran in what he felt was the peaceful & perfect place he'd waited for months to finally call home. He went back to the OHA office to express his utter disappointment & displeasure for being treated in such a way, misinformed by staff and his monetary loss that he couldn't afford. It turns out that they wouldn't return his monetary loss. This is an example of another person who my case manager gave the wrong information and a senior citizen disabled veteran that was shown no respect. As I've said, he is also black, a disabled veteran and male so you tell me which brought on such a discriminatory interaction that was totally unnecessary & disgusting. Also, if his monetary loss wasn't returned by his receiving wrong information, why?  Update: Two years later, James is still in the place he had every right to move from. He's a 'Disabled Vet' whose rights were Maliciously taken away by the same hateful Susana who sentenced my family to homelessness. He too humbled himself by taking it as a loss, although he lost much more than $240, he lost his right to live his golden years where he most desired. He spent years fighting for our freedom of choice as a U. S Marine, only to have his maliciously taken away.

Sincerely,
Irvin Musgrove

**Note: This document was created for Connie Fisher, the HUD Investigator who led the biased investigation that set a HUD investigation time record.**

39.   Angie Pt. 1: **Intentional Discrimination, Intentional Infliction of Emotional Distress, Conspiracy, Immediate Refusal of RAR, Direct Liability**

40.   After Susana & Angie forced us out to live on the streets, I began searching for an apartment on August 15, 2018 . I searched for 6 months without getting a place but didn 't understand why . I decided to discuss it with my Psychiatrist, Dr. Shayna Walker and she knew exactly why and shared it with me. The 1st person I'd ever fallen in love with died in my arms on December 8:, 2017. This caused me to form another disorder , PTSD . Both of us were in the grieving processes , each for the 1st time , until it was suddenly interrupted by their homeless sentence and the mental & emotional pressures leading up to it. We discovered that somehow my initial meeting with Landlords, and in other situations, had been affected in a negative way. We figured out the best way to possibly overcome it and so Dr. Walker wrote an RAR for me to Margery. Angie denied my Drs statement, although my Dr said to contact her. **EXHIBIT 6**

41.   Margery Pt 1: **Intentional Discrimination, Intentional Infliction of Emotional Distress Conspiracy, Refusal of RAR, Direct Liability**

42.   In August I went to the OHA in hopes to have a one on one with Margery as I had in 2014, knowing she could & would help me. **EXHIBIT 5** I tried again in September but she had a man who served as the go between before a meeting with Margery was possible. I did agree to a meeting with him but was later he referred me to Angie instead . I 1st emailed Margery on October 23, 2018 in order to inform her what Susana had been doing to me and to ask for her intervention . I later noticed that she hadn 't responded as she had in the past . I then emailed her on 11/28, after realizing their actions continued. I'd end up emailing her on: 1/18, 1/20, 3/18, 3/22 & 3/28 of 2019, with no response on either occasion . **EXHIBIT 12** 2 of the 3 in March , were pleas for her intervention out of desperation and hoping to appeal to her passion of being a Mother, because I informed her that Noah had been taken by CPS on March 5, 2019 due to us being homeless . I also informed her that Noah had some signs of suicidal thoughts. **EXHIBITS 11 & 12**

43.   Angie Pt 2: Continued from 38 above.

44.   Angie had a meeting scheduled with me to discuss me getting another extension to look for an apartment , which I was now confident about because of my awareness of my issue and receiving the help I'd need in order to finally be housed again. I showed up for the April 16, 2019 meeting and was surprised to see Judy, of the Legal Aid Society, coming the other way down the sidewalk to support me. When we reached Angie's office the meeting began. Angie started it off with a question about what I'd stated in an email to Margery about Susana's actions. I began to explain how Susana had wrongfully

forced my family into homelessness and she interrupted me. This was when she informed Judy & myself that she made the decisions along with Susana, which caught me off-guard. I then mentioned the OHA website guarantees and Angie cut me off by saying that the website had to be wrong . **Note :** *These guarantees are currently in the same place on their site. (Ref to Page 6 Lines 21-28 above)*

45. Then she pulled out a copy of a document that she handed to Judy & myself . She mentioned that Margery had given her my Drs RAR and this was their response to it. She firmly began covering it by saying what they weren't required to provide the type of help that we'd asked for and that they were only required to provide a listing of apartments and it was all they were willing to do for me. I explained that during the time I 'd been looking for an apartment , I was incapable of securing it as a direct result of my disability . I then explained that I'd need for someone to make 2-3 phone calls each morning to Landlords to inform them of my intent to apply . I told her each call would take 30 to 45 seconds each , perhaps less . She more firmly explained that they had not intention of providing this type of help to me. **EXHIBIT 20, 20A**

46.   Margery Pt 2: Continued from 40 above:


47.   Just as Judy and me were about to stand up and leave the meeting, Margery, as if on queue, and whose office was 2 feet from Angie's, suddenly appeared at Angie's door. She looked at Angie and said, "I need to see you ASAP after your meeting is over." She nodded to Judy and then looked directly at me with a smug look on her face and said, "Don't I know you from a year or 2 ago? Aren't you the one with the little boy?" I was immediately affected by her words and got extremely warm inside. I replied, "yes", even though it wasn 't exactly what crossed my mind to say initially , but I composed myself and remained the gentleman . I'm sure she saw my brief struggle with myself . Her and her smug look then returned to her office.

48. Margery hadn't responded to me in 6 super stressful months but chose this moment to make an appearance . It was odd because she had never laid eyes on Noah before nor had she seen us together at any time. It became obvious that she said it just to throw salt on the gaping wound they'd given me out of pure hatred. Judy asked me what that was about when we reached outside. I then explained that I'd been sending Margery emails and the last 2 of 3 were pleas for her help because Noah had been taken by CPS. Judy only looked stunned.  **EXHIBITS 17 & 19**  During this time,  Judy knew how bad they were treating us so a couple of weeks later she tried to reason with Angie. **EXHIBIT 7**

9

49.     Angie Pt 3: Continued from 43 above:

50.     The emailed document Angie had given also firmly expressed their refusal to approve the RAR, along with other expressions. **EXHIBIT 8** She started by making me feel inferior by stating, '*Other voucher holders are able to locate units*'. Next she basically told me that they weren't willing to help me because I was disabled they wouldn't help by stating, '***The letter indicates that you are not able to search for housing on your own, so without additional help from an outside source, providing an extension would not be effective***'. This was their initial reason and the one that was the reason for their refusal. It both denied my RAR's for an extension & for help. Later she'd change the reason to it would be a 'Fundamental Alteration' to the nature of their program. *I still can't understand how a Housing program calling a landlord would fundamentally alter the nature of its program*. Then it stated a sarcastic remark to get to me, 'Will NCHS help you find a unit? At that time it did bother me.

51. Angie took her shots and Margery finished their goal with ever deeper shots. Margery's failure to intervene for months was no coincidence. I'm certain during that time she was carrying on business as usual with the exception of me. In other words, she was acting on all other needs but not on my need. She even went as far as to hire a man as her go between after learning that I had come by in order to speak with her. The fact that they chose this time to say hateful & belittling remarks during the commission of their 'Malicious Refusal' of the RAR that they knew would prolong or make permanent our homelessness, puts this case and their overall intentions as dark and in a different category. We all make choices and often times we have to face it and pay for them.

52.     I maintained civility around them and I'm sure if I hadn't, I'd have to deal with the consequences now, but I couldn't think for them also. We had no fault in this and shouldn't be made to suffer because we utilized the morals & ethics, **they** were sworn to. *If a straight man fights with a gay man while using profanity, he may go free or be sentenced to a year. On the other hand, if he says derogatory remarks like queer, fagot, etc. he'll surely be sentenced to multiple years for a hate crime with 'special circumstances'.* The actions taken against my family are not different and worse because of the cooperative manner in which they carried it out. This left be a target with no where and no one to turn to. Their adding of further damage upon us after 6 months of time for them to reflect on their actions that sentenced a family to suffer, makes them especially evil.

# FIRST CAUSE OF ACTION
## VIOLATION OF SECTION 504 REHABILITATION ACT OF 1973
### (Discrimination Based on Disability)

53.     Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint

54.     The Rehabilitation Act ("Section 504"), includes anti-discrimination provisions prohibiting housing programs receiving federal assistance from discriminating on the basis of disability. Section 504

55.     Defendant , OHA , is a 'City Housing Program ' that receives federal funding in the form of extensive federal grants for services provided to its clients /tenants . Defendant therefore meets Federal financial assistance

56.     Section 504 also defines discrimination as a refusal to make 'Reasonable Accommodations' in rules , policies , practices , or services , when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.

on the basis of disability for the purpose of providing 'Housing Services '. Section 504 provides the following :

[A]n Section 504 of the Rehabilitation Act of 1973 - is a federal law , codified at 29 U.S.C. § 794 , that prohibits discrimination on the basis of disability in federally -assisted programs or activities . Specifically , Section 504 states : No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability , be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program , service or activity receiving federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service . This means that Section 504 prohibits discrimination on the basis of disability in any program or activity that receives financial assistance from any federal agency , including HUD as well as in programs conducted by federal agencies including HUD.

57.     Over the past two decades, federal courts have been nearly unanimous in interpreting federal civil rights laws, including Section 504, to prohibit discrimination or harassment of disabled persons Indeed, the regulations implementing Section 504's nondiscrimination provision mandate that covered must provide what's necessary, within certain guidelines, to enjoy a dwelling as normal people do.

58.     Defendant, OHA, because of the actions of the 4 Defendants who OHA employs(ed), whose individual yet cooperative contributions are acknowledged previously on pages 6-10, discriminated against me, as the disabled person and my son who suffered the same, in violation of Section 504. The violations by intentionally discriminating with maliciousness by: failing to follow normal procedures in my case, bullying us into homelessness , failing to reinstate voucher when unit passed , lied about it being impossible to reinstate , maliciously refused RAR's, used disparaging slurs in the commission of the refusal of the RAR, intentional failure to stop discriminatory actions of they who she's in charge of because she participated, etc. Me & my son have been severl3y aggrieved by this violation of Section.

59.     As a result of their callous conduct I've/We've suffered emotional distress , anguish , embarrassment, humiliation, violation of dignity, loss of enjoyment of life and other compensatory damages.

60 .     Plaintiff seeks relief, including declaratory and injunctive relief.

## SECOND CAUSE OF ACTION
### VIOLATION OF THE FAIR HOUSING ACT 42 U.S.C. § 3604 (3)(B)
### (Discrimination Based on Disability)

61 .     Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

62.     The Fair Housing Act 42 U.S.C. § 3604 (3)(B) prohibits discrimination by a refusal to make reasonable accommodations in rules, policies, practices , or services , when such accommodations may be necessary to afford such a person equal opportunity to use and enjoy a dwelling.

63.     OHA is a HUD funded 'Housing Authority ' that serves Oceanside , CA. It's very sought after with a 10 year waiting list at times . Their clients normally pay 30-40% of their income with OHA paying the remaining portion . They have Case Management for each client and a yearly re-certification . After 1 year's lease is successfully completed , the client has the option of 'Porting Out', transferring to another Housing Authority location , anywhere in the United States & Hawaii . The program is for life unless the family is terminated from the program or their income level exceeds that allowed.

65.     The annual inspection deadline was June 30, 2018. The office manager was aware that the final repair, a tiny light on the exhaust fan in the bathroom, had been completed . She and the 'Housing Inspector, 'have the duty to communicate and schedule the re-inspection of the unit.  They failed. **EXHIBIT 1**

66..     When I received a 'Termination of Housing Choice Voucher' on 7/9/2018, I called Susana to inquire as to why because I'd forgotten . She said failed inspection . I called the inspector who came out within the hour and saw a roach and left.

67.     She came back the next week and it passed. I called Susana and told her it passed and she said her hands were tied and I'd have to move out. **I made a verbal RAR to her twice.** I told her I didn't want to move & plead and gave up. She firmly said I'd have to move out.  **EXHIBIT 20, 20A**

68 .     She chose not to do their normal 'Abatement', rescheduling the inspection , reinstating my voucher after it passed, allow me to stay until I found a place or it passed, etc. **EXHIBIT 3A, 3B, 14, 22A**

**Note:** *22A is to show my friend was reinstated after 1 year; therefore, her saying her hands were tied was a lie because of 'Intentional Discrimination'. Also Angie the supervisor made the **RAR ignored decision** with her.*

69,     As a direct and proximate result of OHA 's wrongful actions , we suffered damages , including severe emotional distress and mental anguish all in an amount to be proven , but exceeding the minimum jurisdictional limits of this court.

70.     Plaintiff seeks relief, including declaratory, punitive and injunctive relief.

### THIRD CAUSE OF ACTION
### THE UNRUH CIVIL RIGHTS ACT, CA. CIV. CODE § 51
### (Discrimination Based on Disability)

71.     Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

72.     The Unruh Civil Rights Act Ca. Civ. Code § 51 provides protection from discrimination by all business establishments in California, including housing and public accommodations. All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability , medical condition , genetic information , marital status, or sexual orientation are entitled to the full and equal accommodations , advantages , facilities , privileges , or services in all business establishments of every kind whatsoever This law requires "Full and equal accommodations , advantages , facilities, privileges or services in all business establishments.

13

73.   OHA is a "business establishment" within the meaning of Unruh Civil Rights Act Cal. Civ. Code Section 51(b).

74.   Plaintiff's severe depression & PTSD disorders constitute a mental disability that limits a major life activity. Cal. Gov't Code §§ 12926(j), 12926.1(c). These disabilities fall within the purview of the Unruh Civil Rights Act. Cal. Civ. Code § 51(e)(1).

75.   OHA's conduct violated the Section 51 by denying (or aiding or inciting the denial of) the Plaintiff's right to full and equal use of the accommodations, advantages, facilities, privileges, or services the OHA offers to clients by denying the Plaintiff's RAR's for: reinstatement of HCV voucher, remaining in home & not being forced into homelessness, minimal help with acquiring an apartment, intervention to protect him from the months of malicious discriminatory actions forced upon him & his family, etc. Accordingly, the Plaintiff is entitled to recover civil penalty authorized by Cal. Civ. Code Section 52(a).

76.   As a direct and proximate result of OHA's wrongful actions, the Plaintiff and his son Noah suffered damages, including severe emotional distress, mental anguish. The Plaintiff was forced to endure excruciating physical pain for months.

77.   Plaintiff seeks relief, including declaratory, punitive and injunctive relief.

## FOURTH CAUSE OF ACTION
### THE FAIR HOUSING ACT 24 CFR § 100.7 - Liability for Discriminatory Housing Practices
### (Discrimination Based on Disability)

78.   Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

79.   Section 100.7 of The Fair Housing Act places direct liability both on a person for their own conduct that results in a discriminatory housing practice and/or for the failure to take prompt action to correct and end a discriminatory housing practice by that person's employee or agent, where the person knew or should have known of the discriminatory conduct.

80.   A person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice.

81.   I had past experience with Margery in 2014 when I whistleblew on Keysa for some actions she took against me that had me stressed out & in fear for a weekend.

14

82.     I contacted Margery on 2 or more occasions by email during that time in 2014, and received very prompt responses to my emails from Margery.

83.     I emailed Margery in hopes for her to intervene for the 1st time on October 23, 2018. In fact, I emailed her on: 10/23 &11/28 of 2018 and on 1/18, 1/20, 3/18, 3/22 & 3,28 of 2019. I never received a response from her. It's obvious she was aware of the discriminatory actions being taken against me, supported it and participated in it. Her failure to answer for 5-6 months is participation in it, especially handing my emails to Margery. **Section 100.7**

84.     As the 'Director' of OHA, Margery's failure to at the least, attempt to intervene and provide relief, with the ability to do so, makes her 'Directly' & 'Vicariously' Liable. This left me trapped with no where or no one to turn to. **Section 100.7**

85.     Defendant's conduct denied the Plaintiff full and equal access to the services, programs and activities offered by Defendant.

86.     As a direct and proximate result of OHA's violation of Section 100.7, Irvin & Noah have been injured as set forth herein.

87.     Plaintiff seeks relief, including declaratory, punitive and injunctive relief as set forth below.

## FIFTH CAUSE OF ACTION
### VIOLATION OF THE FAIR HOUSING ACT C.F.R. 24 § 100.204
### (Discrimination Based on Disability)

88.     Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

89.     Section 100.204 of The Fair Housing Act makes it unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit.

90.     The conduct of the Defendants constituted not only an improper procedure surrounding the processing of a RAR, but it also constituted a total disregard for the requirements that are plainly stated for the RAR itself and a total lack of respect for the many laws surrounding 'Reasonable Accommodations,' as well as the disabled persons for which these laws exist and that were formed with similar meanings.

91.     Despite the numerous laws pertaining to RAR's and the disabled, which can't be used to counter one another, the Defendants stated what they had, would & agreed to do, as well as were required to

15

do, only were mandated to do and decided they'd do; none of which with any consideration given to RAR's and the rights of the disabled , because their decisions were immediate and on-the-spot. An 'Interactive Process' wasn't a part of their thought process. This stood true in every case in re to RAR's.

92.     Their actions were in total violation to Section 100.204 and its requirements.

93.     As a direct and proximate result of OHA's violation of Section 100.204 of the Fair Housing Act, the Plaintiff has been injured as set forth herein.

94.      Plaintiff seeks relief, including declaratory, punitive and injunctive relief as set forth below

**Note:** The only Court Case that is similar to my case is the following case. Not in the actual situation, only in the evil surrounding their actions. It also states that it's contrary to federal law, so that no case law or statute needs to have recognized previously that materially similar conduct is unlawful. Thankfully, it's also an extremely rare case as well. *Gonzalez v. Lee County Housing Authority, 161 F. 3d 1290 (11th Cir. 1998)*

### *Worst Act of All Acts*

95.    *On November 19, 1997, President Bill Clinton, in my opinion, made worst move a President has made, Nixon included. The Adoption and Safe Families Act, is anything besides what its name suggests. Its purpose was meant strictly for Child Protective Services ("CPS"), not to help create healthier families, but to give anywhere from $4,000-$6,000 in bonuses, incentives and other windfalls, for each kid that's permanently adopted out of foster care. This would make some model workers selectively opportunistic and others purely evil. Mr. Clinton should have known that CPS workers would begin to focus on adoption vs helping to create healthier families. What's sad is Mr. Clinton didn't make it alone. others voted on it also.*

## Role it Plays in My Life

96.    That being said, OHA's actions of discrimination with malice, took away more that just our security, it also left us as the exposed targets of CPS. They were able to use blatant lies to take Noah, all because the OHA cooperative teams also had targeted us. This not only caused the temporary destruction of our family unit, denied our right to grieve as wee were doing, it caused much worse due to their desperate need to convince the Courts that a child's adoption would be better than their return home. So the worse they make the parent look, the better their chances are for thousands extra in any case.

97.    Thanks to OHA, I'm now on the permanent Child Abuse Central Index ("C.A.C.I."), which anyone has the honor of being included on, only in the case of severe neglect and worse. I have never severely neglected any child. But in my report I ran across a recent entry that allegedly occurred a day before I moved into Oceana Apts. I allegedly left Noah in our apartment, on moving day or close to it, when he was 9 years old for 2 days by himself, because I just decided to walk out. He was allegedly rescued by 2 police officers who either were told or happened upon him. I went to the Oceanside Police station to get a copy of the report to challenge its legitimacy, knowing it wasn't. The officer at the window directed me to records. I asked the officer there and she said have a seat and she'd be right back. When she returned, she told me she couldn't give it to me and that I'd have to get it from the courts. I had no say in the matter. I told my attorney, who also didn't follow thru coincidentally, that I knew the perfect way to challenge it. She asked how, and I told her: If they came and took Noah after 2 days at 9 years old because I just decided to leave; I'd love to know exactly how I got him back. They surely wouldn't have found me to be fit, and just said, "here you go". CPS would be a certainty and where are their records on it and proof I participated in it. But mostly how would they explain away Noah being with me on those same days? I also went to the Vista Courthouse and tried to obtain it but the Judge denied me access to it. I'm positive that it was used for C.A.C.I. and it's difficult to get off of it once you're on it. Ill find a way though. This is no regular case with normal damages. It's a case that can set a new precedence for other persons or families who have/are /will be treated with hate & disrespect.

# The Devastating Damages From Their Intentional Discrimination (Time-line)

a) **July 15, 2018** - Forced into homelessness by the discriminatory actions of OHA

b) **August 15, 2018** - Actual date we move completely out of Oceana

    1) - Noah went to live with a church friend temporarily, 8/15-11/9 of 2018

c) **August 15, 2018** - I went to live on the streets and couch surf when possible

d) **November 1, 2018** - Had Noah live with another friend temporarily 11/9-12/22 of 2018

e) **December 20, 2018** - I went to live with a really good friend far from Noah's school

f) **December 22, 2018** - Noah came to live with me there.

g) **March 5, 2019** - CPS came and took Noah by way of lies

h) **March 6, 2019** - Noah went to live at Polinsky Center in San Diego

i) **March - June 2019** - Noah depressed & acting out due to situation

    1) At one point said he only wanted to live with dad or God when asked

j) **June of 2019** - Due to behavior, Noah moved to Pasadena, CA to group home

k) **June '19 - February '20** - Drove 200 miles in heavy traffic 2x per month for 2 hr visits

l) **August of 2019** - Joanne Franciscus of Legal Aid made the call OHA refused to make as an RAR. I was able to secure an apartment for us **EXHIBIT 10**

m) **November 19, 2019** - Moved into my new apartments, Veteran's Villas in Escondido

n) **June 11, 2020** - Got 'live in trial' from the Courts for Noah **EXHIBIT 9**

o) **February 4, 2021** - Regained permanent custody of Noah

## Time-line of Separation:

a) **7 Months** - Noah was homeless

b) **16 Months** - Noah was in CPS

c) **16 Months** - I was homeless with bone on bone hip

d) **9 Months** - Traveled 100 miles to Pasadena 2x per month in awful traffic for 2 hr visits

e) **23 Months** - Months Noah & I were separated

100.    Because of their 'Intentional Discrimination' with 'Malicious Intent' in a cooperative effort, with absolutely no regard towards my family, I want 'Court Determined Punitive Damages' awarded, which you can determine after reviewing the severity of their actions against us. For the same reasons, I'd like the long overdue 'Injunctive Relief' ordered, with a restructuring of OHA and training by HUD ordered (which I've read about), to prevent any further violations on any other undeserving families.

101.    **For the**:
    a) **7 months - Noah was Homeless**
    b) **16 months - Noah was in CPS**
    c) **16 months - I was Homeless**
    d) **16 months - 'Pain & Suffering' from a hip bone on bone**
    e) **23 months - Noah & I were separated**
    f) **23 months - Mental Distress & Anguish for Noah**
    g) **23 months - Mental Distress & Anguish for me**
    h) **8 months - Of visiting Noah in Pasadena 2x per month for 2 hr visits**
      **^ Travel time, gas, mileage at 200 round trip**
**I'm asking the Court for the total amount of my original demand=**
**$7,500,000**

*102.   If you look at when I 1st filed, Angie & Susana were on 1 case and Margery & Keysa the other. They were $7,500,000 on each, but when I received my 1st error from the Courts, I chose to combine the 4 Defendants, but not the demand amount.*

103.   Lastly, I'd like for this case to be made known, mainly so any who were violated before and any from the time I filed my complaint thru present day, who have been afraid to speak out, won't feel alone or isolated any longer. Hopefully this case will give them the courage to step out of their fears, face them and move towards the closure they most definitely deserve. I'm not positive they exist, but according to the ease with which they worked cooperatively against me, the possibilities are great for the simple fact that 'Director's' don't suddenly wake up with their morals & ethics removed and for the fact that there wasn't 1 'Voice of Reason' between the 4 of them.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IV.   DEMAND FOR JURY TRIAL** *(Would you like a trial by jury on all claims pursuant to FRCP, Rule 38?)*

⊠ Yes          ☐ No

I declare under penalty of perjury that the foregoing is true and correct.

| 8/1/2021 | | *Irvin Musgrove* |
| Date | | Signature |
| | | Irvin Musgrove |
| | | Printed Name |

20

1

**IV.    DEMAND FOR JURY TRIAL** *(Would you like a trial by jury on all claims*

2
     *pursuant to FRCP, Rule 38?)*

3
         ☒ Yes          ☐ No

4

5
I declare under penalty of perjury that the foregoing is true and correct.

6
_____10/18/2021_____          _____*Irvin Musgrove*_____

7
Date                                    Signature

8
                                        _____Irvin Musgrove_____

9
                                        Printed Name

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28