# EXHIBIT KEY

**EXHIBIT 1 –** Explains the HQS Inspection scheduling protocol for HA's & Landlords

**EXHIBITS 3A & 3B –** OHA's FAQ's page that explains the procedures they follow in re to failed inspections, maintaining the tenancy & what the tenant could expect

**EXHIBIT 5 –** My prior experiences with Margery that shows her response time along with her replies. Reason I felt comfortable turning to her.

**EXHIBIT 6 –** My Dr.'s note/RAR, which she addressed to Margery, who passed it to Angie.

**EXHIBIT 7 –** Judy's email to Angie, Keysa & Susana to try and reason with them.

**EXHIBIT 8 –** Angie's email to me Keysa. The malicious refusal of my & my Dr.'s RAR

**EXHIBITS 9 & 10 –** Letter from CPS in re to Noah and photo of Veteran's Villas.

**EXHIBIT 11 –** About Direct & Vicarious Liability

**EXHIBIT 12 –** Shows the 8+ emails I sent to Margery from October 23, '17 to March 28, '19

**EXHIBITS 14 & 14A –** The 'Housing Choice Voucher Program Guidebook' in re to inspections

**EXHIBIT 17 –** OHA & James: A dream shattered in the blink of her words.

**EXHIBIT 19 –** Last email plea sent to Margery that shows that she knew

**EXHIBITS 20 & 20A –** Cut & Paste: Joint Statements of DOJ & HUD & Approp. Consider.

**EXHIBITS 22 & 22A –** Related case closed in May of 2020 until June of 2021 yet reinstated

**EXHIBIT 30 & 30A -** DOJ & HUD statements on RAR's

**EXHIBIT 38 -** True RFTA procedure

Regardless of how inspection results are recorded the PHA must produce and retain a facsimile that includes PHA-adopted standards. Form HUD-52580, *Inspection Checklist*.

The family and the owner must relieve inspection results. (See Exhibit 10-6, *Sample Notice, Initial Unit Inspection*.) The owner must receive detailed information for all failed and inconclusive inspection items so that he or she is fully aware of the work necessary to pass the HQS inspection.

If the unit does not comply with HQS requirements within the PHA specified time frame, the PHA may cancel the tenancy approval and instruct the family to search for another unit.

The PHA is responsible for establishing a tenancy approval procedure. The procedure should clearly describe the process for the tenant and owner to request an inspection, keeping in mind:

- The requirement to conduct inspections within 15 days or as quickly as possible.

- The PHA may set a deadline for completion of repairs which, if not met, will result in cancellation of the tenancy approval.

- If the time to complete repairs is expected to be lengthy, the tenant may wish to find another unit, or the PHA may decide that the unit is unacceptable for leasing because the owner is non-responsive or has failed to comply with HQS within a reasonable period of time.

The PHA should request that the owner disclose the date the unit will be ready for inspection, as well as all phone numbers where the owner can be reached.

The PHA may either ask the owner to schedule unit inspection or may accept this responsibility itself. In either instance, the PHA should determine its policy and procedure for cases where owner requests are not timely, one or more appointments are cancelled, access is denied or the unit does not pass inspection after a reasonable time.

PHAs with a large number of tenancy approval requests may monitor their processing through a manual or computerized tracking system, which records actions from the time of the request through the execution of the HAP contract. This lets the PHA know where each unit stands in the scheduling and approval process, and provides management data on time frames from request for tenancy approval to HAP execution.

Prior to inspection, PHAs can use several methods to inform owners about HQS requirements: owner briefing materials, telephone discussion, inclusion of HQS requirements in tenancy approval materials, monthly newsletters to owners in the program, owner workshops, and public meetings with current and prospective owners. It is advantageous to the PHA and the prospective tenant if the unit passes inspection on the first attempt. The PHA should have a system to track units requiring reinspection to determine HQS compliance for all fail and inconclusive items.

# EXHIBIT 1

## What happens if the owner still doesn't correct the problems?

The Housing Authority will automatically re-inspect the unit. If the owner fails to correct the problems, the Housing Authority will stop paying the landlord. The owner will not receive any Housing Assistance Payments until the repairs have been made and verified by a Housing Authority Inspector. However, you must still keep paying your portion of the rent so that you are still meeting the terms of the lease. The Housing Authority's abatement of the unit should not lead to an eviction.

> **N O T E -** *The above OHA FAQ, is extremely definitive in what their protocol is in re: to their Annual Inspections, as well as HUD's. According to their permanent posting, with any failure by a landlord to correct noted repairs, they will stop payment(an abatement) until they're completed.*

## What happens if the owner doesn't make the repairs after the Housing Assistance Payment has been stopped?

Your Section 8 HS may give you a new voucher to find another unit. Your Section 8 HS will end the Contract after notifying you and the owner.

> **N O T E :** *The OHA FAQ below, definitely details what the tenant can expect in re: to an 'annual inspection' failure. It leaves no reason for a family's concern of, moving suddenly, storage fees, hardships due to disability, homelessness, etc. It guarantees by saying, 'will', for up to 120 in home to apartment search or remain stable if the inspection passes prior to the 120 days.*

## What happens if I don't want to move?

In order to receive Section 8 assistance, you must live a unit which is decent, safe and sanitary. You will have up to 120 days to find new housing. If you do not find housing within 120 days, and the unit still does not pass inspection, you will lose your Section 8.

EXHIBIT 3A

## SCREENING AND VERIFICATION

- Making exceptions to screening criteria regarding criminal histories, past rental histories, or credit histories based on mitigating circumstances. (24 CFR 982.553(2)(ii)(C) and PIH Notice 2015-19)
- Providing extra time to gather documentation of eligibility.
- Accepting alternative forms of documentation for proof of age, identity, or social security number. (HUD Frequently Asked Questions)

## ISSUANCE, HOUSING SEARCH, AND LEASE UP

- Allowing a friend, family member, service provider, or other person to attend the briefing session with the applicant.
- Holding the briefing in a location that is wheelchair accessible and includes an accessible bathroom.
- Sending the briefing letter to any secondary contacts listed.
- Allowing extensions to the housing search. (24 CFR 982.303(b)(2))
- Providing a list of accessible units. (24 CFR 982.301(b)(12))
- Providing a higher Utility Allowance. (24 CFR 982.517(e))
- Including a participant's live-in aide or overnight support staff when determining the unit size for the household. (24 CFR 982.316, 982.402(b)(6) or PIH Notice 2011-32)
- Providing a higher payment standard or asking HUD to approve a higher payment standard. (24 CFR 982.503(c)(2)(ii))
- Providing a higher payment standard to help cover the costs of accessibility modifications.
- Allowing HCV vouchers to be used in special housing types such as shared housing, group homes, single room occupancy buildings, and congregate housing. (24 CFR 982 Subpart M)
- Allowing voucher holders to rent from relatives. (24 CFR 982.306(d))
- Including proximity to community amenities and essential services in rent reasonableness determination.

## MAINTAINING THE HCV VOUCHER

- Rescheduling missed recertification appointments.
- Rescheduling missed re-inspection appointments.
- Providing home visits to conduct recertifications.
- Allowing additional time for the annual recertification process.
- Requesting that portability requirements for non-residents be waived to ensure proximity to critical supports and services.
- Reinstating a voucher that was terminated for cause, due to mitigating circumstances.
- Reinstating a voucher that was terminated because of an extended absence from the unit due to a disability-related issue.

# EXHIBIT 3B



**Rent Portion** ➤  Inbox ✕   Vital Importance ✕

**Irvin Musgrove** <imusgrove174@gmail.com>
to mpierce

Jun 3, 2014, 1:57 PM  ☆ ↩ ⋮

Mrs. Pierce,
First of all I'd like to thank you for your assistance last week and mostly how kind and respectful you were. You know of my situation and for my need to feel security for my son and I, there's a concern I have.
Last week you told me Ilene needed to fill out forms and come into the housing office. I by the way had overlooked an appointment in my stressful excitement. She talked to Keysa and Keysa told her she didn't need her and that she would still need her being clear in writing but didn't elaborate on that. She did go on to tell her she didn't understand why I needed to meed with people who didn't know the details of my case because she was my housing specialist. Then she told her I needed to bring in payment verification from Calworks which I also did in March or April of this year and it's the same. I know you told me you would roll it my rent payment portion back until the 1st of June, so I'm telling you this just in the case Keysa refuses to after her return from lunch. I provided Calwork verification approximately 20 or so minutes ago and I'm going to attempt to meet briefly with her only for this situation with rent & SDG&E. I apologize for bringing this to you but I don't feel as though I have a choice. If she does refuse, I'm not going to pay my rent today because I took care of SDG&E yesterday, which will cause me to also have to pay a $50 late fee tomorrow when I pray this situation is resolved. Thank you for listening.

Irvin Musgrove

*Email Response Time*
*= 4 Minutes*

**Margery Pierce** <MPierce@ci.oceanside.ca.us>
to me

Jun 3, 2014, 2:01 PM  ☆ ↩ ⋮

Dear Irvin,

*From texting these words that inspire!*

Keysa is in a hearing right now and she said that it will take about an hour. When she returns, she is going to calculate your rent and yes, it will be effective June 1st. She will send the verification to you in the mail which will go out tomorrow. She also said that if you want to call her around 3:30-4pm. She can tell you what your new rent portion is going to be. Don't worry...everything will be fine!!!!

Sincerely,
Margery
...

*To speaking these words that scar deeply, knowing Noah was taken months earlier!*

*Her response time was 4 minutes & 12 work hours when there was no true threat to my family.*

**Irvin Musgrove** <imusgrove174@gmail.com>
to Margery

Aug 29, 2014, 9:03 PM  ☆ ↩ ⋮

*"Don't I know you from a year or 2 ago? Aren't you the one with the little boy?"*

Hi Ms. Pierce:
I'm emailing you to inform you about a situation you may or may not be aware of, in order that things remain on the level about a client of the Oceanside Housing Authority who I mentioned to Housing out of concern.
A little history: Ms. Barbara Winters of 1964 College Blvd #158 had a prior caretaker Mary who lived in with her son & boyfriend/husband. There were several instances of her husband Brad verbally chastising & even threatening Ms. Winters which she called in to Housing about in fear and I disclosed at one point. When she would insist they or he leave, he'd threaten her which I offered my help to stop being that she is disabled, elderly and in a wheel chair and for the simple fact that it's abusive period. I had her convinced to get a restraining order but she later declined after coming to an agreement that he move out by January 1st of 2014 which gave them 2-3 more months. They ended up staying past that date as a result. She ultimately obtained new caretakers, but recently allowed him to return. He bought her liquor for her birthday, to my understanding, and about a month ago she was forcibly returned back to a nursing facility and not expected to return. She even called in her rented items to be picked up by the rental company Aarons who was supposed to pick up her big screen & couches today but for some unknown reason failed to do so. She also left her donated computer & air conditioner behind which may be taken by Brad.
Longer story short, her caregiver and Brad have continued to reside in her apartment since she left knowing she wouldn't return; of course all of this is to my understanding. If you know about this situation of course disregard this letter, but if not you may want to check into it because it appears they have no intention of vacating as required by Housing. They could actually go on paying her portion for some time. I'm informing you because I trust in your decision making more so than our property managements.

Thank You,
Irvin Musgrove
...

*Email Response Time*
*= 12 Work. Hrs*

**Margery Pierce** <MPierce@ci.oceanside.ca.us>
to me

Sep 2, 2014, 8:02 AM  ☆ ↩ ⋮

Thank you for the information. I have forwarded it to the Section 8 Supervising Housing Specialist.
...

*EXHIBIT 5*



we're here for you.

**Main Contact**
📞 (760) 736-6767
📠 (760) 566-1501

☐ **NCHS Carlsbad Health Center**
1295 Carlsbad Village Drive
Carlsbad, CA 92008

☐ **NCHS Encinitas Health Center**
1130 Second Avenue
Encinitas, CA 92024

☐ **NCHS La Mision Health Center**
3220 Mission Avenue Unit 1
Oceanside, CA 92054

☐ **NCHS Mission Mesa Dental**
2216 S. El Camino Real, Suites 121-122
Oceanside, CA 92054

☐ **NCHS Mission Mesa Pediatric Health Center**
2210 Mesa Drive, Suite 300
Oceanside, CA 92054

☐ **NCHS Mission Mesa Women's Health Center**
2210 Mesa Drive, Suite 5
Oceanside, CA 92054

☐ **NCHS Mission Mesa Women's Health Center (Satellite)**
161 Thunder Drive, Suite 210
Vista, CA 92083

☐ **NCHS Oceanside Health Center (Loma Alta)**
605 Crouch St.
Oceanside, CA 92054

**NCHS Oceanside Specialty Health Center**
☐ Behavioral Health ☐ Chiropractic
☐ Dental
619 Crouch St. #100
Oceanside, CA 92054

**NCHS Perris Health Center**
☐ Medical ☐ Dental
1675 N. Perris Blvd. #G1
Perris, CA 92571

**NCHS Ramona Health Center**
☐ Medical ☐ Dental
217 E. Earlham
Ramona, CA 92065

**NCHS San Marcos Family Practice**
☐ Adults ☒ Behavioral Health
☐ Dental ☐ Pediatrics
☐ Women's Health
150 Valpreda Road
San Marcos, CA 92069

www.nchs-health.org

a california *health* center

---

Irvin Musgrove
180 Canyon Dr Apt 78
Oceanside, CA 92054

3-25-2019

To Margery Pierce,

Mr. Musgrove has been under my care of the behavioral health department at North County health services since December 12, 2013. He has been long-term client of our practice. Client is adherent to his medication regimen and attends treatments regularly. Client suffers from major depressive disorder and PTSD. Client remains in long-standing remission from substances. Client has dedicated his last several years to caregiving for his young son. A major focus of Mr. Musgrove's treatment has been to make sure that he getting treatment resources for his son concurrently. He also referred his son to another internal therapist for support and assistance. He is dedicated and motivated to improve his health so his son has a better life and education. There have been no abuse, neglect or other concerns noted throughout my care of patient towards his son. Client's intentions to take care of his son remain positive and for his son's overall well being. We support his reunification with his son. We will continue to assist with case management and other support for housing and other resources that have been greatly difficult for the last 1-2 years. Client with significant grief in the context of loss of his longterm girlfriend that have worsened his mood. We will continue to provide support to client and encourage ongoing support for his family. Due to his medical disabilities client will need assistance with finding and obtaining housing. Please direct any further questions with a client with permission to the number listed below.

Sincerely,

Shayna Walker MD
Tel-760-736-6767
Fax- 760-736-8680
3-25-2019

*MISSION: To improve the health status of our diverse communities by providing quality healthcare that is comprehensive, affordable, and culturally sensitive.*

# EXHIBIT 6

**From:** Judy Davis <JudyD@lassd.org>
**Sent:** Friday, May 3, 2019 10:20 AM
**To:** Angie Hanifin <AHanifin@oceansideca.org>; Keysa Machado <KMachado@oceansideca.org>; Susana Sandoval <SSandoval@oceansideca.org>
**Cc:** Joanne Franciscus <JoanneF@lassd.org>
**Subject:** FW: Dr. Statement

**Warning: External Source**

Good morning,
 We are still waiting for a response from the Oceanside Public Housing Authority as to whether or not you will release the Voucher to Mr. Musgrove.
I have attached the Doctor's note dated March 25, 2019 supporting Mr. Musgrove's need for a Reasonable Accommodation.
 The last two sentence make it clear "due to his medical disabilities client will need assistance with finding  an obtaining housing. Please direct any further questions with client with permission to the number listed below.
Shyna Walker MD.
 This letter was dated and sent to the Oceanside Public Housing Authority in March 2019,
What resources  has the Oceanside Housing Authority provided   to Mr. Musgrove based on this letter?
Was he ever provided with a Social Worker to help him find a unit?
Did the Oceanside Housing Authority contact Shyna Walker MD?
The  letter also confirms he suffers from major depressive disorder and PTSD>.
This may also be a reason he cannot initiate first contacts when looking for a unit.  He has stated he seems to do better if someone is able to help him in the beginning in finding a unit.
A major focus of Mr. Musgrove's treatment has been obtaining treatment services for his son.
His son  is currently not with Mr. Musgrove.
Every day the Oceanside Housing Authority delays the decision on providing Mr. Musgrove with a voucher, is a day he can't qualify/or look for housing.  It is another day of homelessness for him and another day he is separated from his son.
 To make matters worse, the Oceanside Housing Authority terminated his voucher June 30, 2018 for unit not passing HQS standards, then passed the unit a week later.
He was advised by the Oceanside Housing Authority  he needed to move out.  Legally,  Mr. Musgrove had other options.
 Please review this letter and see what we can do to assist Mr. Musgrove and his child.
 Sincerely,

Judy Davis
Administrative Hearing Advocate
LEGAL AID SOCIETY OF SAN DIEGO, INC.
216 S. Tremont Street
Oceanside, CA 92054

EXHIBIT 7 

Angie Hanifin <AHanifin@oceansideca.org>
Attachments
Apr 4, 2019, 4:47 PM
to Keysa, me

Hello Mr. Musgrove:

> *The following statements & decisions, were made after the OHA learned that for the initial 9 months that I'd unsuccessfully searched for a home and which they often referred to; my disability's recently acquired PTSD, which derived from trauma caused by the death of a loved one, was to blame for my failure to acquire a dwelling on what would be my 3rd apartment search in 8 years.*

The Housing Authority has received your request for extension and reasonable accommodation. Additional information is needed as you have already had 9 months to find a unit, far longer than allowed by our administrative policy. I would like to discuss with you further what Susana Sandoval (Soto) did to your family. I am not clear as to what you are alleging specifically.

1.   Please provide how much longer of an extension you are requesting? The Housing Authority will not grant indefinite extensions.
2.   Extension request form and list of units you have looked for.
3.   The Housing Authority does not provide the services you are asking for - assistance needed to find and obtain an apartment. The Housing Authority is required to:

When issuing a Housing Choice Voucher to a family which includes an individual with disabilities, include a current listing of available accessible units known to the PHA and, if necessary, otherwise assist the family in locating an available accessible dwelling unit;

III. Take into account the special problems of locating an accessible unit when considering requests by eligible individuals with disabilities for extensions of Housing Choice Vouchers

You have not indicated that you need an accessible unit. The Housing Authority has provided you with information about available units. Other voucher holders are able to locate units. If you do need an accessible unit, I have attached information put together for persons with disabilities. In addition, following is a link to the Housing Authority website
https://www.ci.oceanside.ca.us/gov/ns/housing/section8/tenants.asp#disabled Please review the Community Resources for Persons with Disabilities for a list of accessible units in Oceanside. The page also includes links to apartment complexes and property management companies that have worked with the Section 8 program in the past, as well as a link to Go Section 8 Online Rental Listings.

The Housing Authority provides these resources and it is the participant's job to contact landlords and find a unit. If you need resources for a security deposit, you may contact 211 or Interfaith Community Services for possible assistance.

Please update your request, as well as provide an extension request listing the units you have looked at. Upon returning to the office, I will be sending a letter to North County Health Services that the Housing Authority does not provide services to help participants locate units, other than providing referrals as listed above. The letter indicates that you are not able to search for housing on your own, so without additional help from an outside source, providing an extension would not be effective. Will NCHS help you find a unit? Their letter seems to say that they can provide this service. I don't see anything in the case history indicating that you reported that our son is no longer living with you. Has your income changed as well?

Please feel free to contact me so we can discuss this further. I will return to the office on April 11th .

Color Key:

■ States their right to deny my RAR, makes clear their obligations & offers to only help to locate accessible dwelling unit.

■ Blatantly degrades me by comparing my inability to locate a unit to other voucher holders who do.

■ Reconfirming their role and the disabled person's job to contact landlords & find units even when unable to do so.

■ Put me on notice that they will contact NCHS vs my doctor, to put them on notice to prevent further misunderstandings.

■ Blatantly refused my RAR extension request because I was disabled and in need of assistance from a 3rd party.

■ Sarcastic shot at NCHS re: apartment search assistance and intentional misinterpretation of my doctor's statement.

# EXHIBIT 8



# County of San Diego

SAN DIEGO, CA 92123-1507
(858) 616-5811 • FAX (858) 616-5908

June 16, 2020

Irvin Musgrove
1540 S Escondido Blvd Apt 3310
Escondido, California 92025

To whom it my concern:

This letter is to confirmed that the child, Noah Musgrove was returned to his father's home on June 11, 2020. Mr. Musgrove was instructed by Child Welfare Services to apply for CALWORKS in order to meet this child's basic needs. Please contact me at the phone number or email me if you have any questions. My office hours are from Tuesday through Friday from 7AM to 5:30PM.

Sincerly,

*Jesus Gonzalez*

Jesus Gonzalez, M.S.
Protective Service Worker
HHSA, Child Welfare Services
7947 Mission Center Court
San Diego, CA 92108
**(619) 767-5277**
**Fax (619) 767-5418**
Email: Jesus.Gonzalez@sdcounty.ca.gov

# EXHIBIT 9



Veteran's Villas Escondido
1540 South Escondido Blvd., Escondido, CA 92025

*EXHIBIT 10*

**9. Section 100.7. Liability for discriminatory housing practices.**

# 24 CFR § 100.7 - Liability for discriminatory housing practices.

- CFR

prev | next

### § 100.7 Liability for discriminatory housing practices.

**(a)** *Direct liability.*

**(1)** A person is directly liable for:

> **(i)** The person's own conduct that results in a discriminatory housing practice.

> **(ii)** Failing to take prompt action to correct and end a discriminatory housing practice by that person's employee or agent, where the person knew or should have known of the discriminatory conduct.

> **(iii)** Failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it. The power to take prompt action to correct and end a discriminatory housing practice by a third-party depends upon the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party.

**(2)** For purposes of determining liability under paragraphs (a)(1)(ii) and (iii) of this section, prompt action to correct and end the discriminatory housing practice may not include any action that penalizes or harms the aggrieved person, such as eviction of the aggrieved person.

**(b)** *Vicarious liability.* A person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law.

[81 FR 63074, Sept. 14, 2016]

## EXHIBIT 11



search/AHanifin%40oceansideca.org/KtbxLwgxCHhWwJDRWpkpqSZgbJwNLbNWqB



I've attached some of the files for my case that refer mostly to Margery refusing to answer complaints over an 8 month period. There's als
labeled 'Overview signed'. Thank you. I hope this helps. If there's more ill send it to you.

## 11 Attachments



PDF Overview signed.pdf    PDF 5th Contact with M...    PDF 2nd Contat with Ma...    PDF 3rd Contact with M...

PDF 6th Contact with M...    PDF 7th Contact with M...    PDF 8th Contact with M...    PDF Angies Email Corre...



PDF 1st Contact with M...    PDF FedCodeofRegMA...    PDF 4th Contact with M...    **EXHIBIT 12**

            

**Annual Inspection Process and Procedure**

The annual inspection process includes scheduling the unit for inspection, notifying owners and tenants of the inspection date and time, conducting the inspection, enforcing HQS requirements, and when necessary, taking action to abate payments and terminate HAP contracts and program assistance.

- The unit must be in compliance with HQS requirements throughout the assisted tenancy.

- Each unit must be inspected annually during assisted tenancy to determine if the unit meets HQS. The inspection must be conducted within twelve months of the previous inspection to meet SEMAP requirements discussed in Section 10.7.

- The PHA must notify owners and tenants of HQS deficiencies in writing, and indicate a time period in which to make HQS corrections of that the PHA complies with SEMAP requirements discussed in Section 10.7.

- The PHA must abate housing assistance payments to the owner for failure to correct an HQS violation under the following circumstances:

  - An emergency (life-threatening) violation is not corrected within 24 hours of inspection and the PHA did not extend the time for compliance;

  - A routine violation is not corrected within 30 days of the inspection and the PHA did not extend the time for compliance.

- Abatements must begin on the first of the month following the failure to comply.

- The PHA must terminate the HAP contract if repairs are not made. The PHA must decide how long abatement will continue prior to contract termination. The PHA should not terminate the contract until the family finds another unit provided the family does so in a reasonable time.

- The PHA must terminate program assistance to families who fail to correct HQS deficiencies that they caused. The PHA should notify the owner of its intent to terminate the family's program assistance so the owner can begin eviction procedures. The PHA should continue to pay the owner until the eviction is completed.

The PHA may set policy regarding tenant and owner presence at the inspection.

The inspector conducts the unit inspection. Each item on the inspection checklist must receive a rating of pass, fail, or inconclusive. The inspector should make clear notes about the nature of all fail and inconclusive items. For the unit to receive a pass rating, no fail or inconclusive items can be noted on the inspection checklist.

# EXHIBIT 14

Improvements which have occurred since the previous unit inspection, addition of amenities or services, and changes in type of or responsibility for utilities should be noted and reported to appropriate PHA staff.

The inspector may record recommended improvements or items that should be brought to the attention of the owner or tenant, but are not HQS deficiencies.

Written notification to the owner and/or tenant is required for all items for which fail or are inconclusive.  The notice must include a list of HQS deficiencies and the correcting deadline. (See Exhibit 10-7a and Exhibit 10-7b, *Sample Notice, Owner and Tenant HQS Deficiencies*.). Reinspection or PHA verification that failed and/or inconclusive items are corrected is required.

Any time an inspector is present in an assisted unit, the inspector has the right to conduct a full inspection.  If new HQS items are discovered during the time of a reinspection, the new items must be noted and the owner and/or tenant must be notified to correct the deficiencies.

Owners are responsible to the PHA for compliance with all HQS items except those specifically assigned to tenants.

Tenants are responsible to correct HQS fail and inconclusive items resulting from:

- Failure to pay for tenant-supplied utilities;

- Failure to supply appliance(s) required by the lease; or

- Damage to the unit.

### 10.7    COMPLAINT INSPECTIONS

The PHA must investigate complaints about HQS matters that are registered by tenants, owners or the general public.

Violations resulting from complaint inspections are treated in the same manner as annual inspection violations.  Failure to comply with violation notices issued from complaint inspections result in abatement of payment to owners and/or termination of program assistance for tenants.

PHAs should schedule complaint inspections based upon the nature of the complaint.  Staff that receive complaints should distinguish between emergency (life threatening) and routine matters and act accordingly.

### Abatement of Payments

The PHA must abate HAP payments to owners who do not comply with notifications to correct HQS deficiencies within the specified time period:  24 hours or 30-days depending upon the

# EXHIBIT 14A

Wednesday 07/24/2019

Connie Fisher,

James planned on moving out of his apartments and move into the senior apartments about 2 blocks away. He's preferable to a much quieter environment and got Section 8 under the V.A.S.H. program. He's also black, male and a disabled VET. He had been on their waiting list for quite a few months and finally received the call he's longed for. The manager invited him to go and look at his future residence and to discuss their next move. He loved it because of the peace & solitude so he left her with a $240 deposit to hold it and her being very familiar with OHA gladly accepted it knowing their requirements. He then went with excitement and gave his current manager the proper notice re: his intent to move.

When the time was right, he proceeded to the OHA office to get the RFTA form for the inspector to fill out.  When he got there, he told the receptionist that he needed the form and she told him he couldn't get the form until he moved out. He told her she must be wrong because that made no sense. She repeated herself and so did he. Suddenly my worker, Susana Soto, emerged from her office and took over the conversation because her office is feet from the reception area. She firmly told him that he'd have to completely move out and bring the proof before he could get the RFTA form he needed. He told her it didn't make sense and wanted to know what he was supposed to do with his furniture & belongings and also where was he supposed to stay during the days until the inspection was scheduled. She repeated what she had told him and wouldn't allow him to speak again about it in a ruder way. He turned and left in disgust and returned to manager of the Senior Apartments and explained what had occurred to which she also disagreed with what he was told from having experience with OHA's procedures. He was left with no other alternative but to forfeit the $240 deposit he'd given to her and go to his manager to inform her that he no longer had plans to move. More importantly he was blatantly denied his right to live as a disabled veteran in what he felt was the peaceful & perfect place he'd waited for months to finally call home. He went back to the OHA office to express his utter disappointment & displeasure for being treated in such a way, misinformed by staff and his monetary loss that he couldn't afford. I'm not certain how that turned out, but I don't think in a positive way.

This is an example of another person who my case manager gave the wrong information and a senior citizen disabled veteran that was shown no respect. As I've said, he is also black, a disabled veteran and male so you tell me which brought on such a discriminatory interaction that was totally unnecessary & disgusting. Also, if his monetary loss wasn't returned by his receiving wrong information, why? Could it be because her discriminatory actions were supported by her superiors as well? If it was returned, how can they make up for his greatest loss, months of waiting on his dream place only to lose it because of the malicious actions of my worker and the loyal support she shockingly receives from those in place to insure there's fair and impartial treatment, PERIOD.

His name is James and his cell # is: 760-696-3196.


Sincerely,
Irvin Musgrove


# EXHIBIT 17

From: "Irvin Musgrove" <imusgrove174@gmail.com>
To: "Margery Pierce" <mpierce@ci.oceanside.ca.us>
Date: 3/28/2019 5:11:23 AM
Subject: Plea

Ms. Pierce,
Please, put yourself in my shoes, even Noah's shoes. His mother abandoned him in 2011. My fiance' whom he loved and was his mom, died much too early and too basically abandoned him. CPS wrongfully takes him for he & I being homeless but staying at a friends temporarily. They saw to it that I too abandoned him. He's a frightened little boy who love everyone and especially his dad who love him with all his heart. He'd rather be with God if there's no being with me and acts out for what could be a number of reasons considering. CPS has my hands tied so I can't go in and just take my son home. He's always seen me as an example of strength, fairness, truth, equality, and safe. Now his thoughts are all over the place and I'm afraid i'm going to wake up to a phone call. You put a program in place that was responsible for bringing us together for which I thank you very much! But it was allowed to tear us apart after we'd become so close and excited about our upcoming times together because we love each other, and all because of a non-advocating worker who made decisions that she knew would most likely cause homelessness, move related hardships, school unsteadiness, stress, even more hardships & stress on the disabled, etc. HUD has cared so much but not doesn't care that it has most of the responsibility in a child who is mentally & emotionally at the point of severely suicidal thoughts & related actions towards those caring for him, because his father has been forced out of his life as we were forced from our stable environment? This situation needs immediate attention before anything else occurs that could further damage the health of my family. What if it were your son or grandson and you were treated the exact same way by those with a moral & ethical obligation to conduct themselves and make decisions in a pro-family manner. Does my son's mental state as well as his dad's not matter to an organization who formed such a program that successfully kept him and his father stable for the past 6+ years? I'd settle with a voucher after being ported out of Oceanside where I'm sure I'll at least receive some sort of support and assistance since I'm in need of it. I remember when Patricia & Rita Mendoza came to my apartment with a total show of support & not to chastise me but to remind me that I was here to change my life for the better therefore I needed to make the necessary changes. My respect & admiration they gained just for showing they cared. Even you when I met with you on a prior occasion. Noah and I only have one another and time may be ticking on his ability to hold it together because he just turned on the 1st of March. I didn't realize that I had new limitations until I met with my Psychiatrist a couple of days ago so I know exactly what I need in order to be successful at securing us a place. I didn't know that grief could affect a person to such a degree and I relate to Noah better also because I can empathize now with him. Please help us right the wrong Susana so graciously did to my family.

Sincerely,

Irvin Musgrove

# EXHIBIT 19



**U.S. DEPARTMENT OF JUSTICE**
CIVIL RIGHTS DIVISION



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
OFFICE OF FAIR HOUSING AND EQUAL OPPORTUNITY

*Washington, D.C.*
*May 17, 2004*

**JOINT STATEMENT OF
THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
AND THE DEPARTMENT OF JUSTICE**

***REASONABLE ACCOMMODATIONS UNDER THE
FAIR HOUSING ACT***

## Introduction

The Department of Justice ("DOJ") and the Department of Housing and Urban Development ("HUD") are jointly responsible for enforcing the federal Fair Housing Act[1] (the "Act"), which prohibits discrimination in housing on the basis of race, color, religion, sex, national origin, familial status, and disability.[2] One type of disability discrimination prohibited by the Act is the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with a disability the equal opportunity to use and enjoy a dwelling.[3] HUD and DOJ frequently respond to complaints alleging that housing providers have violated the Act by refusing reasonable accommodations to persons with disabilities. This Statement provides technical assistance regarding the rights and obligations of persons with disabilities and housing providers under the Act relating to

---

[1]　　The Fair Housing Act is codified at 42 U.S.C. §§ 3601 - 3619.

[2]　　The Act uses the term "handicap" instead of the term "disability." Both terms have the same legal meaning. *See* Bragdon v. Abbott, 524 U.S. 624, 631 (1998) (noting that definition of "disability" in the Americans with Disabilities Act is drawn almost verbatim "from the definition of 'handicap' contained in the Fair Housing Amendments Act of 1988"). This document uses the term "disability," which is more generally accepted.

[3]　　42 U.S.C. § 3604(f)(3)(B).

EXHIBIT 20

the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

**12. When and how should an individual request an accommodation?**

Under the Act, a resident or an applicant for housing makes a reasonable accommodation request whenever she makes clear to the housing provider that she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability. She should explain what type of accommodation she is requesting and, if the need for the accommodation is not readily apparent or not known to the provider, explain the relationship between the requested accommodation and her disability.

An applicant or resident is not entitled to receive a reasonable accommodation unless she requests one. However, the Fair Housing Act does not require that a request be made in a particular manner or at a particular time. A person with a disability need not personally make the reasonable accommodation request; the request can be made by a family member or someone else who is acting on her behalf. An individual making a reasonable accommodation request does not need to mention the Act or use the words "reasonable accommodation." However, the requester must make the request in a manner that a reasonable person would understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability.

Although a reasonable accommodation request can be made orally or in writing, it is usually helpful for both the resident and the housing provider if the request is made in writing. This will help prevent misunderstandings regarding what is being requested, or whether the request was made. To facilitate the processing and consideration of the request, residents or prospective residents may wish to check with a housing provider in advance to determine if the provider has a preference regarding the manner in which the request is made. However, housing providers must give appropriate consideration to reasonable accommodation requests even if the requester makes the request orally or does not use the provider's preferred forms or procedures for making such requests.

> **Example:** A tenant in a large apartment building makes an oral request that she be assigned a mailbox in a location that she can easily access because of a physical disability that limits her ability to reach and bend. The provider would prefer that the tenant make the accommodation request on a pre-printed form, but the tenant fails to complete the form. The provider must consider the reasonable accommodation request even though the tenant would not use the provider's designated form.

**13. Must a housing provider adopt formal procedures for processing requests for a reasonable accommodation?**

- 10 -

EXHIBIT 20A



# CITY OF OCEANSIDE
## NEIGHBORHOOD SERVICES DEPARTMENT / HOUSING

### RESPONSE TO REQUEST FOR A
### REASONABLE ACCOMMODATION

April 21, 2021

\* Kimberly Buntin
\* 1872 College Blvd #109
\* Oceanside, CA 92056

You requested:

❑ Reinstatement of Section 8 Rental Assistance.

**At this time we are not granting your request for a Reasonable Accommodation based on the information that you have currently provided. The accommodation you requested is not reasonable because:**

❑ Your Section 8 Rental Assistance terminated on 5/31/21 and you did not contact our office until November 2020, almost six months after we had terminated the contract and dropped your file.

**We decided this because:**

**Your file was dropped after 3 notifications in writing that you had not submitted requested documents for your annual recertification. You provided documents on June 1, 2020 and you were sent another letter advising that your file had been terminated and could not be reactivated unless you provided further documentation. You did not provide documentation and did not contact our office until November 2020.**

**We used these facts to review your request:**

**Documentation that you provided asking to be reinstated. A statement from a medical professional dated December 4, 2020, the statement was vague as to medical issues and did not verify that you were incapacitated or hospitalized during the time that your recertification documents were requested and due. We also used documentation from The Boulevard Apartments stating that they had informed you that the housing assistance payment was being terminated and that they continuously asked you about payment.**

We based this decision on the regulations detailed in the Administrative Plan for the Section 8 Housing Choice Voucher Program.

If you disagree with this decision, you may provide additional documentation or contact the Oceanside Housing Authority for further discussion or to request a phone meeting.

Sincerely,

Keysa Machado
Supervising Housing Specialist

EXHIBIT 22

NEVADA STREET ANNEX        300 N. COAST HIGHWAY        OCEANSIDE, CA 92054        TEL (760) 435-3360        FAX (760) 754-8918

| From: | "Kimberly Buntin" <buntinkimberly79@gmail.com> |
|---|---|
| To: | imchimed11@gmail.com |
| Date: | 5/20/2021 9:27:51 PM |
| Subject: | Fwd: Kimberly Buntin |

Here's email from housing

---------- Forwarded message ---------
From: Keysa Machado <KMachado@oceansideca.org   >
Date: Thu, May 20, 2021, 7:41 AM
Subject: RE: Kimberly Buntin
To: Boulevard Apartments <boulevard@hcares.com   >, buntinkimberly79@gmail.com
<buntinkimberly79@gmail.com   >

Hi,

This file has been reinstated retroactively and the termination has been overturned.  I have sent out rent change notices to both parties that are effective June 1, 2020 and June 1, 2021.

Please let me know if you have further questions.

Thanks,

*Keysa Machado*

*Supervising Housing Specialist*

*(760) 435-3367*

For local information and daily updates on COVID-19, please visit **www.coronavirus-sd.com**   . To receive updates via text, send **COSD COVID19** to **468-311**. 

**From:** Keysa Machado
**Sent:** Wednesday, May 19, 2021 7:39 AM
**To:** 'Boulevard Apartments' <boulevard@hcares.com   >
**Subject:** RE: Kimberly Buntin

This is correct, I am currently working with her and notify both parties as soon as any decision has been made.

5/21/2021                                        EXHIBIT 22A

reasonable accommodations.[4]

**Questions and Answers**

**1. What types of discrimination against persons with disabilities does the Act prohibit?**

The Act prohibits housing providers from discriminating against applicants or residents because of their disability or the disability of anyone associated with them[5] and from treating persons with disabilities less favorably than others because of their disability. The Act also makes it unlawful for any person to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford ... person(s) [with disabilities] equal opportunity to use and enjoy a dwelling."[6]  The Act also prohibits housing providers from refusing residency to persons with disabilities, or placing conditions on their residency,  because those persons may require reasonable accommodations. In addition, in certain circumstances, the Act requires that housing providers allow residents to

---

[4]        Housing providers that receive federal financial assistance are also subject to the requirements of Section 504 of the Rehabilitation Act of l973.  29 U.S.C. § 794.  Section 504, and its implementing regulations at 24 C.F.R. Part 8, prohibit discrimination based on disability and require recipients of federal financial assistance to provide reasonable accommodations to applicants and residents with disabilities.  Although Section 504 imposes greater obligations than the Fair Housing Act, (*e.g.*, providing and paying for reasonable accommodations that involve structural modifications to units or public and common areas),  the principles discussed in this Statement regarding reasonable accommodation under the Fair Housing Act generally apply to requests for reasonable accommodations to rules, policies, practices, and services under Section 504.  *See* U.S. Department of Housing and Urban Development, Office of Public and Indian Housing, Notice PIH 2002-01(HA) (www.hud.gov/offices/fheo/disabilities/PIH02-01.pdf) and "Section 504: Frequently Asked Questions," (www.hud.gov/offices/fheo/disabilities/ sect504faq.cfm#anchor272118).

[5]        The Fair Housing Act's protection against disability discrimination covers not only home seekers with disabilities but also buyers and renters without disabilities who live or are associated with individuals with disabilities  42 U.S.C. § 3604(f)(1)(B), 42 U.S.C. § 3604(f)(1)(C), 42 U.S.C. § 3604(f)(2)(B), 42 U.S.C. § (f)(2)(C).  *See also* H.R. Rep. 100-711 – 24 (reprinted in 1988 U.S.C.A.N. 2173, 2184-85) ("The Committee intends these provisions to prohibit not only discrimination against the primary purchaser or named lessee, but also to prohibit denials of housing opportunities to applicants because they have children, parents, friends, spouses, roommates, patients, subtenants or other associates who have disabilities."). *Accord*: Preamble to Proposed HUD Rules Implementing the Fair Housing Act, 53 Fed. Reg. 45001 (Nov. 7, 1988) (citing House Report).

[6]        42 U.S.C. § 3604(f)(3)(B).  HUD regulations pertaining to reasonable accommodations may be found at 24 C.F.R.  § 100.204.

EXHIBIT 30

provider must make an exception to its "no pets" policy to accommodate this tenant.

**7.  Are there any instances when a provider can deny a request for a reasonable accommodation without violating the Act?**

Yes.  A housing provider can deny a request for a reasonable accommodation if the request was not made by or on behalf of a person with a disability or if there is no disability-related need for the accommodation.  In addition, a request for a reasonable accommodation may be denied if providing the accommodation is not reasonable – *i.e.*, if it would impose an undue financial and administrative burden on the housing provider or it would fundamentally alter the nature of the provider's operations.  The determination of undue financial and administrative burden must be made on a case-by-case basis involving various factors, such as the cost of the requested accommodation, the financial resources of the provider, the benefits that the accommodation would provide to the requester, and the availability of alternative accommodations that would effectively meet the requester's disability-related needs.

When a housing provider refuses a requested accommodation because it is not reasonable, the provider should discuss with the requester whether there is an alternative accommodation that would effectively address the requester's disability-related needs without a fundamental alteration to the provider's operations and without imposing an undue financial and administrative burden. If an alternative accommodation would effectively meet the requester's disability-related needs and is reasonable, the provider must grant it.   An interactive process in which the housing provider and the requester discuss the requester's disability-related need for the requested accommodation and possible alternative accommodations is helpful to all concerned because it often results in an effective accommodation for the requester that does not pose an undue financial and administrative burden for the provider.

> **Example:**  As a result of a disability, a tenant is physically unable to open the dumpster placed in the parking lot by his housing provider for trash collection. The tenant requests that the housing provider send a maintenance staff person to his apartment on a daily basis to collect his trash and take it to the dumpster. Because the housing development is a small operation with limited financial resources and the maintenance staff are on site only twice per week, it may be an undue financial and administrative burden for the housing provider to grant the requested daily trash pick-up service.  Accordingly, the requested accommodation may not be reasonable.  If the housing provider denies the requested accommodation as unreasonable, the housing provider should discuss with the tenant whether reasonable accommodations could be provided to meet the tenant's disability-related needs – for instance, placing an open trash collection can in a location that is readily accessible to the tenant so the tenant can dispose of his own trash and the provider's maintenance staff can then transfer the trash to the dumpster when they are on site.  Such an accommodation would not involve a

- 7 -

*EXHIBIT 30A*

# If I find a new apartment, can I move in right away?

No. You must follow the steps below:

1. Give written notice of your intention to move to your owner with a copy to your HS

2. Schedule a move appointment with your HS

3. Housing Choice Voucher and Request for Tenancy Approval (RFTA) will be issued at your move appointment

4. Find a new unit and discuss the Section 8 Program with owner

5. Submit the RFTA to your HS

6. The Housing Authority schedules a Housing Quality Standards (HQS) inspection of the unit and surveys rents in the area

7. If there are problems in the new unit, the owner makes repairs.  If there are no deficiencies, the unit passes the inspection

8. Housing Authority re-inspects for deficiencies, if necessary

9. If the unit passes inspection, and you, the Housing Authority, and the owner agree to the Rent, Start Date, Security Deposit, and other Lease terms, the Housing Authority authorizes you to move in after you and the owner sign the Lease

---

**EXHIBIT 38**
From OHA Website

Back